*PMN*

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Ahmed Aydeh AL-JABRATI | ) | Case No.  13-2231 TJS |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ August 2010 - Present _____ in the county of _____ Baltimore City _____ in the

_____ District of _____ Maryland _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 371 | Conspiracy to commit food stamp fraud |
| 7 USC 2024 | |

This criminal complaint is based on these facts:

See attached affidavit of Special Agent Jeffrey Weiland

☑ Continued on the attached sheet.

_____
*Complainant's signature*

SA Jeffrey Weiland
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: September 17, 2013

_____
*Judge's signature*

City and state:  _____ Baltimore, Maryland _____

The Honorable Timothy J. Sullivan
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A CRIMINAL COMPLAINT

Your Affiant, Jeffrey Weiland, being duly sworn, deposes and states the following:

## I.    INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since March 2008. I am currently assigned to the Public Corruption squad in the Baltimore Division of the FBI. The Public Corruption Squad investigates crimes involving fraud against the government. As a Special Agent, I have investigated crimes including arson, forced labor trafficking, distribution of controlled substances, money laundering, possession of stolen goods in interstate commerce and racketeering.

2.      This affidavit is submitted in support of the Government's application for criminal complaint charging **Ahmed Aydeh AL-JABRATI** with conspiracy to commit food stamp fraud, in violation of 18 U.S.C. § 371.

## II.   BACKGROUND

3.      On September 12, 2013, a grand jury sitting in and for the District of Maryland returned an indictment against Abdullah ALJARADI, charging him with food stamp fraud, in violation of 7 U.S.C. § 2024 and wire fraud, in violation of 18 U.S.C. § 1343. The charges stemmed from ALJARADI's operation of two convenience stores, Second Obama Express ("Second Obama") and D&M Deli & Grocery ("D&M Deli") in Baltimore, Maryland.

4.      On September 13, 2013, the Honorable Susan K. Gauvey, U.S. Magistrate Judge for the District of Maryland, signed search warrants for Second Obama and D&M Deli based on the probable cause set forth in an affidavit signed by your affiant. That affidavit is attached hereto as Attachment A, and incorporated by reference.

## III.   **PROBABLE CAUSE**

### A.   **Background**

5.      On July 28, 2010, FNS received a Form 252 SNAP Application for Second Obama.  The Application was signed by **Ahmed Aydeh AL-JABRATI** and identified ATA Express, Inc. as the corporate owner of Second Obama with a mailing address of 242 North Milton Avenue, Baltimore, MD 21224.  The address for Second Obama listed on the application is 901 Harlem Avenue, Suite, A, Baltimore, Maryland 21217.  FNS authorized Second Obama as a SNAP retailer on August 17, 2010.

6.      According to records from the Maryland State Department of Assessments and Taxation ("SDAT"), ATA Express, Inc. was incorporated on December 19, 2008 and ALJARADI is listed as the corporation's Director and Resident Agent.  On December 21, 2010, ATA Express, Inc. changed its name to D&M Grocery, Inc., but made no changes as to directors, officers or resident agent. On October 1, 2012, the corporation was forfeited for failure to file a property tax return for 2011.

7.      The Form 252 Applications submitted for Second Obama contained the following certification, signed under penalties of perjury by **AL-JABRATI** (emphasis added):

> I will receive Supplemental Nutrition Assistance Program training materials upon authorization. It is my responsibility to ensure that the training materials are reviewed by all firm's owners and all employees (whether paid or unpaid, new, full-time or part time); and that all employees will follow Supplemental Nutrition Assistance Program regulations. If I do not receive these materials I must contact the Food and Nutrition Service to request them;
>
> I am aware that violations of program rules can result in administrative actions such as fines, sanctions, withdrawal or disqualification from the Supplemental Nutrition Assistance Program; I am aware that violations of the Supplemental Nutrition Assistance Program rules can also result in Federal, State and/or local criminal prosecution and sanctions;
>
> I accept responsibility on behalf of the firm for violations of the Supplemental

Nutrition Assistance Program regulations, including those committed by any of the firm's employees, paid or unpaid, new, full-time or part-time. **These include violations such as, but not limited to:**

> **Trading cash for Supplemental Nutrition Assistance Program benefits (i.e. trafficking);**
>
> Accepting Supplemental Nutrition Assistance Program benefits as payment for ineligible items;
>
> Accepting Supplemental Nutrition Assistance Program benefits as payment on credit accounts or loans;
>
> Knowingly accepting Supplemental Nutrition Assistance Program benefits from people not authorized to use them.

### B.    September 17 Search Warrants

8.    On September 17, 2013, the search warrants for Second Obama and D&M Deli were executed by your Affiant and several other law enforcement agents. ALJARADI was located and arrested pursuant to an arrest warrant on the above-listed charges. ALJARADI consented to a search of his residence, which was located in the same building, above Second Obama. ALJARADI also agreed to speak with law enforcement agents. ALJARADI admitted his own involvement in the food stamp fraud scheme and stated that **AL-JABRATI** was his partner in the business and was also aware of and involved in the food stamp fraud scheme.

9.    Also on September 17, 2013, **AL-JABRATI** was located by law enforcement agents. **AL-JABRATI** also lives above the Second Obama building. **AL-JABRATI** consented to a search of his residence, at which time law enforcement agents located over $200,000 in U.S. Currency. **AL-JABRATI** stated that the currency was proceeds of the business, and that he did not have income from any other source.

## IV.    CONCLUSION

10.    As stated above, there is probable cause to believe that **Ahmed Aydeh AL-JABRATI** committed the crime of conspiracy to commit food stamp fraud, in violation of 18 U.S.C. § 371.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Special Agent Jeffrey Weiland
Federal Bureau of Investigation

Subscribed and sworn to before me.

September 17, 2013
DATE

The Honorable Timothy J. Sullivan
United States Magistrate Judge

4:19 pm
TIME

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

Your Affiant, Jeffrey Weiland, being duly sworn, deposes and states the following:

## I.   **INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have

been so employed since March 2008. I am currently assigned to the Public Corruption squad in

the Baltimore Division of the FBI. The Public Corruption Squad investigates crimes involving

fraud against the government. As a Special Agent, I have investigated crimes including arson,

forced labor trafficking, distribution of controlled substances, money laundering, possession of

stolen goods in interstate commerce and racketeering.

## II.   **LOCATIONS TO BE SEARCHED**

2.      This affidavit is submitted in support of the Government's application for

issuance of a warrant to search the premises of:

> a.      **SECOND OBAMA EXPRESS ("SECOND OBAMA")**, 901
> Harlem Avenue, Suite, A, Baltimore, Maryland 21217, more specifically
> described in Attachment A-1, and seize the items described on Attachment B; and

> b.      **D&M DELI AND GROCERY ("D&M DELI")**, 901 Harlem
> Avenue, Suite, B, Baltimore, Maryland 21217, more specifically described in
> Attachment A-2, and seize the items described on Attachment B.

## III.   **BACKGROUND**

3.      Based on the facts listed herein, there is probable cause to believe the owner and

employees of **SECOND OBAMA** and **D&M DELI** have committed and are committing the

following violations of the United States Code: fraud associated with the Supplemental Nutrition

Assistance Program, in violation of 7 U.S.C. § 2024 and wire fraud in violation of 18 U.S.C.

§ 1343 (the "Subject Offenses").

Page 1 of 35

4.       There exists probable cause to believe that within the premises of **SECOND OBAMA** and **D&M DELI**, there is evidence of the commission of a crime, contraband, the fruits of a crime or things otherwise criminally possessed and instrumentalities of the Subject Offenses.

A.       **The Supplemental Nutrition Assistance Program**

5.       The Supplemental Nutrition Assistance Program ("SNAP"), formerly known as the Food Stamp Program, is a federally funded, national program established by the United States Government to alleviate hunger and malnutrition among lower income families.   The United States Department of Agriculture (USDA) administers the SNAP through its agency, the Food and Nutrition Service (FNS).   FNS is responsible for the authorization and disqualification of retail food establishments participating in the redemption of SNAP benefits.   Social service agencies from each state share responsibility with FNS for administration of the program through authorization and revocation of individual SNAP benefit customers.

6.       In Maryland, the program is administered by the Maryland Department of Human Resources ("DHR") and is known as the Food Supplement Program ("FSP").   In 1993, Maryland changed the issuance method of SNAP benefits from a traditional paper coupon system to an Electronic Benefits Transfer ("EBT") system.   DHR awarded Xerox (formerly ACS) the current network management contract for its FSP EBT system.   The system is similar to those used by financial institutions and credit card companies.   FSP customers are issued plastic EBT cards which contain an embedded magnetic stripe that stores basic information required for food purchases.   Retailers approved by FNS to accept SNAP are assigned an FNS authorization number, which is unique to each authorized retailer, and in some cases, are provided with a point of sale ("POS") device to access the electronic funds allocated to customer's  EBT cards (larger

Page 2 of 35

retailers use their own POS devices). POS devices communicate with the Maryland EBT central database to debit a customer's available SNAP benefit balance for the cash value of eligible food items purchased.

7.      When an EBT card is swiped through a retailer's POS terminal, the store employee or customer, (depending on the type of POS device) must actively select SNAP/food stamp purchase as the transaction type from the POS terminal menu. The employee must then enter the total dollar amount of the transaction to be conducted. The transaction request is completed when the cardholder enters their unique personal identification number ("PIN"). This causes an electronic transmission of information through a series of network switches and gateway to the central Maryland EBT database located in Texas, which maintains customer account balance information. The EBT Contractor verifies the retailer is authorized to conduct SNAP EBT transactions. The Maryland EBT system verifies the amount of benefits available, authorizes the transaction and deducts the purchase amount from the customer's available balance. The system also calculates cumulative FSP sales for each retailer and authorizes electronic payments to the retailer's bank account.

8.      Once the transaction is approved, information flows back to the POS terminal and the store employee receives confirmation that the cardholder's account has been successfully debited. Unlike the procedure with the original paper food stamp coupons, FSP EBT transactions are made for the exact amount of the sale and no change is given to the cardholder. SNAP reimbursements are paid to authorized retailers through a series of electronic funds transfers. On a daily basis, Xerox, located in Austin, Texas, reconciles accounts for participating MD SNAP retailers by drawing on funds available through an open letter of credit with the American Management Agent ("AMA").

Page 3 of 35

9.     In order to participate in SNAP as an authorized retailer, a business must submit FNS Form 252, Food Stamp Program Application for Stores, and the owner [OR] manager of that business must acknowledge receiving mandatory SNAP retailer training.  This training from FNS is designed to educate and train store owners and management personnel on the proper procedures for the acceptance and redemption of SNAP benefits.   Training materials are provided in six different languages, including English and Arabic.  Store owners/managers are responsible for training their employees in the proper procedures for the program.  Retailers may lose their authorization to redeem SNAP benefits if they break program rules or no longer qualify for participation in the program.

10.     Pursuant to the Food and Nutrition Act and regulations promulgated by the Secretary of Agriculture, SNAP authorized retailers may only accept SNAP benefits in exchange for eligible food items.  SNAP benefits may not, in any case, be exchanged for cash (a practice commonly referred to as trafficking) or other forbidden items such as alcohol, paper products, tobacco products, lottery tickets, or fuel

11.     In accordance with 7 U.S.C. § 2024 and Maryland Code Section 8-503, SNAP benefits may only be used by members of the household to which they were issued.  Any individual who is not a member of a given household may not use, obtain, or purchase that household's SNAP benefits.

**B.     Maintenance of Records**

12.     Based on my experience, and the collective experience of other law enforcement officers involved in this investigation, I know that convenience stores such as **SECOND OBAMA** and **D&M DELI** must maintain records to facilitate operation of the business.  Product invoices detailing the volume of wholesale food purchased by the store can be compared to the

Page 4 of 35

corresponding retail sales negotiated using SNAP benefits. Based on this comparison, it can be determined whether a particular store has adequate inventory to support the volume of food purportedly purchased with SNAP benefits.

13.     Based on my experience, and the collective experience of other law enforcement officers involved in this investigation, I also know that principles (owners, officers, and managers) of businesses dealing in the illegal purchase of SNAP benefits commonly maintain evidence of assets purchased with the proceeds of such illegal enterprises, including but not limited to, books, records, receipts, notes, logs, ledgers, canceled checks, bank statements, telephone bills, electronically stored records, and other sources of information relating to the purchase, sale, transfer, or concealment of illegally obtained proceeds and assets.

14.     Based on my experience and the experience of other agents who have investigated similar types of cases, I know that the instrumentalities of these crimes (EBT cards), the cash used to purchase SNAP benefits facilitating these crimes, the purchasing records, sales records, and contact information for food vendors that would prove legitimate and illegitimate SNAP sales, are often kept on the person of the owner or employee's at a store or in vehicles under the control of the owner or employees at the warrant location.

15.     One common method of facilitating SNAP fraud is for the owner of a store to give cash to a card holder for their benefits and in return take custody of the recipient's EBT card. The store owner then takes the recipient's EBT card to a wholesale store or grocery store and buys food for personal use or to restock the inventory of their own store. In this way the fraudulent EBT transaction is not associated with the POS machine of the subject store, but the store owner still receives full value (in goods) for the benefits he or she purchased from the recipient. Because of this common methodology to perpetrate the fraud, it is usual for store

Page 5 of 35

owners who perpetrate SNAP fraud to have the EBT cards of other people on their person. This affiant has personal knowledge from a prior EBT fraud case using just such a scheme that store owners who purchased EBT cards from recipients in volume kept EBT cards in their personal vehicles and on their person ostensibly so they would have easy access to these cards when driving to a grocery or wholesale store. Other investigations have also directly shown that store owners keep large sums of cash on their person which are used to purchase SNAP benefits.

16.     The scheme of paying below value in cash for benefits and then taking possession of the recipient card to use at another retail or wholesale location is not isolated to store owners. Store employees often commit this crime as well. Employees working in a store that is committing SNAP fraud commonly know the crime is being perpetrated by the owner. This is because customers will constantly enter a store known to be committing this fraud and solicit the employees to buy SNAP benefits. Employees will often buy the cards with their personal funds for their own use or may purchase the card with store funds and keep the card to turn over to the store owner at a later time. Based on my training and the experience of other agents who have investigated similar types of cases, I know that employees of subject stores have been found to have EBT cards in other people's names on their person at the time of a search warrant that were purchased from the benefit recipient for cash.

17.     Based on my experience and the experience of other agents who have investigated similar types of cases, I know that product invoices, sales receipt confirmations, product delivery confirmations, vendor contact information, account numbers, vendor related correspondence, and other information that can be used to identify food purchases and sources are delivered and kept electronically in email form. The advent and proliferation of Personal Data Assistants (PDAs) and Smart Phones that can connect directly to the internet to receive and

store email as well as access websites, such as vendor websites for ordering purposes, means that owners of stores can now keep much of their record keeping and vendor lists stored in their phones and on their persons at all times.

### C.    Request to Search Computers and Electronic Storage Media

18.    Based on my experience, and the experience of other agents who have investigated similar types of cases, I know that convenience stores commonly use computers to perform business calculations, compile and store inventory records, purchase inventory, issue payroll checks, and maintain employee records.  I request authority to search any computer hardware or computer-related equipment capable of creating and/or storing information in electronic or magnetic form seized during the execution of this search warrant, for the items listed on Attachment B, pursuant to the protocol listed on Attachment C.

19.    Computer-related equipment includes, but is not limited to, central processing units, and/or peripheral equipment used to facilitate the creation, transmission, encoding or storage of information.  I seek the authority to search for any or all information and/or data stored in the form of magnetic or electronic encoding on computer media, or on media capable of being read by a computer, or with the aid of computer-related equipment.  This media includes, but is not limited to, floppy disks, fixed hard disks, removable hard disk cartridges, tapes, laser disks, videocassettes, CD-ROMs, zip disks, smart cards, memory sticks, memory calculators, PDAs, USB flash drives and/or other media that is capable of storing magnetic coding.

20.    Based on my training and information provided to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during a search of a premises it is not always

Page 7 of 35

possible to search computer equipment and storage devices for data for a number of reasons, including the following:

21.     Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.   There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

22.     Searching computer systems requires the use of precise, scientific procedures that are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted or password-protected data.   Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.    Since computer data is particularly vulnerable to inadvertent or unintentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conduct a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

23.     The volume of data stored on many computer systems and storage devices typically will be so large that it is highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-sided pages of text.  A single gigabyte of storage space or 1,000 megabytes is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers.  Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80

Page 8 of 35

million pages of data, which, if printed out, would completely fill a 35' x 35' x 10' room to the ceiling. Further, a 160 GB drive could contain as many as approximately 150 full run movies or 150,000 songs.

24.  Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard", is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography". For example, by using steganography a computer user can conceal text in an image file, which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

## IV.  PROBABLE CAUSE

### A.  Store History of SECOND OBAMA and D&M DELI

25.  On July 28, 2010, FNS received a Form 252 SNAP Application for **SECOND OBAMA**. The Application was signed by Ahmed Aydeh Al-Jabrati and identified ATA Express, Inc. as the corporate owner of **SECOND OBAMA** with a mailing address of 242 North Milton Avenue, Baltimore, MD 21224. The address for **SECOND OBAMA** listed on the application is 901 Harlem Avenue, Suite A, Baltimore, Maryland 21217. FNS authorized **SECOND OBAMA** as a SNAP retailer on August 17, 2010.

26.     On July 28, 2011, FNS received a Form 252 SNAP Application for **D&M DELI**. The Application was signed by ABDULLAH T. **ALJARADI** ("ALJARADI") and listed **ALJARADI** as the owner of **D&M DELI** and indicated that the principal place of business was 242 North Milton Avenue, Baltimore, MD 21224. The address for **D&M DELI** listed on the application is 901 Harlem Avenue, Suite B, Baltimore, Maryland 21217.  FNS authorized **D&M DELI** as a SNAP retailer on October 12, 2011.

27.     According to records from the Maryland State Department of Assessments and Taxation ("SDAT"), ATA Express, Inc. was incorporated on December 19, 2008 and **ALJARADI** is listed as the corporation's Director and Resident Agent.  On December 21, 2010, ATA Express, Inc. changed its name to D&M Grocery, Inc., but made no changes as to directors, officers or resident agent. On October 1, 2012, the corporation was forfeited for failure to file a property tax return for 2011.

28.     The Form 252 Applications submitted for both **SECOND OBAMA** and **D&M DELI** contained the following certification, each signed under penalties of perjury by the applicant (emphasis added):

> I will receive Supplemental Nutrition Assistance Program training materials upon authorization. It is my responsibility to ensure that the training materials are reviewed by all firm's owners and all employees (whether paid or unpaid, new, full-time or part time); and that all employees will follow Supplemental Nutrition Assistance Program regulations. If I do not receive these materials I must contact the Food and Nutrition Service to request them;
>
> I am aware that violations of program rules can result in administrative actions such as fines, sanctions, withdrawal or disqualification from the Supplemental Nutrition Assistance Program; I am aware that violations of the Supplemental Nutrition Assistance Program rules can also result in Federal, State and/or local criminal prosecution and sanctions;
>
> I accept responsibility on behalf of the firm for violations of the Supplemental Nutrition Assistance Program regulations, including those committed by any of

the firm's employees, paid or unpaid, new, full-time or part-time. **These include violations such as, but not limited to:**

> **Trading cash for Supplemental Nutrition Assistance Program benefits (i.e. trafficking);**
>
> Accepting Supplemental Nutrition Assistance Program benefits as payment for ineligible items;
>
> Accepting Supplemental Nutrition Assistance Program benefits as payment on credit accounts or loans;
>
> Knowingly accepting Supplemental Nutrition Assistance Program benefits from people not authorized to use them.

29.     Based on surveillance conducted on July 30, 2013, your Affiant further believes that employees of **SECOND OBAMA** use inventory and supplies interchangeably between the two stores. At around 11:41 a.m. that day, an agent observed that the security gate was pulled down over the entrance to **D&M DELI**. An unidentified male employee exited **SECOND OBAMA**, opened the security gate at **D&M DELI**, which is located next door, and entered **D&M DELI**. Several minutes later, the same individual left the store carrying several six packs of soda. He took the soda into **SECOND OBAMA**. At approximately 11:47 a.m., that same employee, along with another employee, entered **D&M DELI** and each came out each carrying a cardboard box. One of the individuals closed the security gate and then both employees took the boxes directly into **SECOND OBAMA**.

30.     Surveillance conducted on July 24, 2013 revealed that **ALJARADI**[1] opened **SECOND OBAMA** for business. At approximately 5:15 am, law enforcement observed that **SECOND OBAMA** was closed with the security gate pulled down over the entrance. **ALJARADI** then exited what appeared to be a side door of **SECOND OBAMA** and walked

---

[1]     ALJARADI was identified by your affiant based on his New York driver's license photograph.

across the street to a parked Nissan Minivan, which your Affiant has determined from MVA records is registered to **ALJARADI**. After briefly accessing his vehicle, **ALJARADI** walked back across the street to **SECOND OBAMA**. He then opened the security gate to the store and entered the premises. Fifteen minutes later, the store's lights came on and it appeared to be open for business.

31.     On August 14, 2013, a FBI task force officer (TFO) noticed **ALJARADI's** vehicle parked illegally in the 1600 block of West North Avenue. He contacted Baltimore Police Communications and found out that the Maryland Vehicle Administration did not report a valid license registered to the owner. Based on that information, the TFO approached the operator of the vehicle, who was placing a child car seat into the vehicle The TFO advised the operator that he was parked illegally and that their appeared to be a discrepancy with the registration. The TFO asked for a driver's license and registration to the vehicle. A man handed him a New York license with the name of ABDULLAH THBET **ALJARADI** and the address 1089 Eastern Parkway, D15, New York, New York on it.   The TFO asked **ALJARADI** why he maintained a New York license when he had the vehicle registered to 901 Harlem Avenue Baltimore, Maryland. **ALJARADI** advised that he resides at both locations and travels back and forth from the New York address to the Maryland address (901 Harlem Avenue residence). Once it was verified that **ALJARADI** had a valid license, the TFO left him with a verbal warning to park his vehicle legally.

**B.     Description of Stores and Inventory**

32.     According to official records on file with FNS, as well as my direct observations,[2]

---

2     The observations are based on the video recordings taken by the cooperating witnesses and described below.

**SECOND OBAMA** and **D&M DELI** are small convenience stores that stock a very limited inventory of FNS eligible and non-FNS eligible food and beverage products. **SECOND OBAMA** and **D&M DELI** are located right next door to each other on Harlem Avenue.

33.     On August 29, 2013 an agent with USDA executed an undercover store site visit at **SECOND OBAMA**. The agent described the store as being small in size with a double sided shelving unit in the middle of the store creating two aisles containing sodas, pasta sauce, ketchup and some dry food. The store had shelves along three walls of the store containing soft drinks, frozen pizza, dry foods, cereals, pastries, chips, incense, fragrance and hair products. In the right corner of the store was a large glass enclosure approximately 5' x 10' in dimension. The glass enclosure housed the cashier and register along with shirts, cigarettes, hair products, and other store merchandise. The store does not use a laser code scanner for transactions and there are no carts or hand baskets for customer use. There was a glass door which appeared to be the only entrance into the enclosure. The agent observed a white door with a gold knob in the left back corner of the store. The door appeared to be flimsy, like an interior door to a room. The door did not appear to be an access to the exterior of the store.

34.     Based on interviews of, and the video taken by, the cooperating witnesses, your Affiant knows that the interior of **D&M DELI** is very similar to **SECOND OBAMA**. The video did not capture the store in sufficient detail to list all of the items inside of **D&M DELI**, but the video available and the interviews of the cooperating witnesses was sufficient to determine that the inventory is similar in type and amount to **SECOND OBAMA**, and to determine that D&M DELI does not use a laser barcode scanner, there is only one cash register, and there are no carts or hand baskets for customer use.

C.    **Investigative Operations**

1.    **Surveillance of Customer Transactions**

35.    In the course of the investigation, your Affiant and other law enforcement agents have conducted surveillance of customers entering and exiting **SECOND OBAMA** and **D&M DELI** and then matched the results of that surveillance to FNS records of EBT transactions. When comparing the dollar amounts of the EBT transactions with the corresponding visual surveillance of customers leaving **SECOND OBAMA** and **D&M DELI**, the dollar amount of EBT purchases was far greater than could be expected, given the small amount of items carried by the customers observed. Many customers, including those who EBT transactions were made just prior to them leaving the store, made EBT transactions worth $100 or more, but nevertheless left the store empty-handed. Many similar customers left the stores with only a beverage or a small bag.    Given the relatively limited selection and low unit price of the items for sale at **SECOND OBAMA** and **D&M DELI**, it is highly unlikely, in my experience, that an individual could spend over $100 in SNAP benefits on qualifying items at **SECOND OBAMA** or **D&M DELI** without purchasing a large number of items.

36.    On April 8, 2013, Agents conducted surveillance on **SECOND OBAMA**. During the around 8 hour period from approximately 9:35 a.m. to approximately 5:30 p.m., approximately 30 people were observed ~~exiting~~ entering the store and approximately 36 people were observed exiting the store. Almost all of the customers leaving the store were observed leaving the store with a small plastic bag, no items, or one small item such as a soda can in their hand. Only one customer appeared to leave the store with more than one plastic bag. During the period of surveillance, there were 99 transactions. 53 were for under $20, an amount the affiant believes to be consistent with purchasing items which could be carried in a small bag or a pocket. The

other 46 ranged from $21 to $199.52. 27 transactions were over $40. 11 transactions were over $99.59 and were far too large, in your Affiant's experience, to purchase the small items stocked **SECOND OBAMA** without carrying out a large number of items. I believe, therefore, that these large transactions conducted during the period of surveillance were fraudulent FNS benefits transactions.

### 2.    Undercover Transactions

37.    In the course of the investigation, two cooperating witnesses ("CW") and an undercover law enforcement agent ("UC") conducted a series of EBT transactions in both **SECOND OBAMA** and **D&M DELI**. In each instance, as outlined below, the CW or UC obtained cash in exchange for one-half of the total amount deducted from the EBT card in the transaction. The CW or UC made no purchases of any sort in connection with any of these EBT transactions. Each of the transactions was electronically recorded.

<u>January 7, 2013 Transaction</u>

38.    On January 7, 2013, acting at agents' direction, a cooperating witness ("CW-1") and the UC entered **SECOND OBAMA**. There were two unidentified male ("UM-1 and UM-2") employees in the store at the time. The UC and CW-1 approached UM-1, who was at the cash register, behind the glass wall. CW-1 introduced the UC to UM-1 as the CW-1's child. CW-1 gave UM-1 his/her EBT card ending in 2624 and asked to exchange the full $154.20 worth of USDA SNAP EBT benefits on the card for cash. UM-1 agreed and gave CW-1 $77.10 after swiping the CW-1's EBT card and having CW-1 enter the PIN.

39.    The UC then gave UM-1 another EBT card, this one card ending in 2640, stating that there was $400 in benefits on the card. When UM-1 replied that he did not want to "do" all $400, the UC asked UM-1 to do $200. UM-1 agreed. UM-1 then swiped the EBT card for a

Page 15 of 35

total of $199.98 and the UC entered a PIN on the machine. UM-1 then gave the UC $100 in cash from the register. Neither the UC nor CW-1 spoke to the UM-2 who was present during the transaction.

40.    It was confirmed that FNS records of these two transactions reflect that UM-1 swiped the EBT cards for twice the amount of cash provided to CW-1 and the UC. FNS deposited a total of $354.18 (over two transactions) into the **SECOND OBAMA** account for the transactions, resulting in a net profit of $177.08 to **SECOND OBAMA** for the two trafficking cash transactions.

<u>February 11, 2013 Transaction</u>

41.    On February 11, 2013, CW-1 and a second cooperating witness, CW-2, entered **SECOND OBAMA**. They approached an unidentified employee[3] at the cash register and CW-2 handed him his/her card. The unidentified employee said "the machine was down" and told them to "go next door", to see "DANNY." CW-1 and CW-2 left **SECOND OBAMA** and walked into **D&M DELI**. There was only one employee in **D&M DELI**. They approached the individual, whom I believe to be "DANNY," and engaged in a conversation which was captured by the recording equipment carried by CW-2. The following is an excerpt transcribed from the recording made during the transaction:

| | |
|---|---|
| CW-1: | I'm trying to get rid of some stamps . |
| CW-2: | Hey how are you doing? Could I, I got 260 on here. |
| CW-1: | Could you do the whole thing? |
| DANNY: | How much do you want? How much do you want? |
| CW-2: | How much can you, how much can you get me? |

---

3    Although the transaction was audio and video recorded, the recording did not allow your Affiant to positively identify the employee.

| DANNY: | How much do you want? |
|---|---|
| CW-2: | Um 100? |
| DANNY: | Uh no I don't have one. |
| CW-1: | So can [he/she] do, can [he/she] do $100 for $50? Can you do 50? |
| DANNY: | Uh, I don't have money now. |
| CW-1: | How much can, how much can, [he/she] need a couple dollars, [he/she] gotta get to work. How much can you do? Can you do 30? |
| DANNY: | [unintelligible] |
| CW-1: | They said the machines down. That's why we usually go in here |
| DANNY: | Yeah but we don't have money here. Let me call. |
| CW-1: | Yeah if he got the money you can take what's his name |
| DANNY: | [makes phone call in unidentified foreign language] |
| CW-1: | Okay go back next door? Thanks man. |

42.     CW-1 and CW-2 went back to **SECOND OBAMA**. When they approached the same unidentified employee again, he said that the machine was still down. CW-2 explained to the employee that DANNY had sent them back. The employee told them to wait. CW-2 stated that he/she "wanted to do $100.00." The employee said "$50 for $100 right?" CW-2 said yes. The employee swiped the card, and CW-2 entered his/her PIN. The employee took $50.00 cash from the register and gave it to CW-2 along with a receipt, instructing CW-2 to put the card, cash, and receipt in his/her pocket before walking out of the store.

43.     It was confirmed that FNS records of this transaction reflect that at this time, a $99.99 transaction for CW-2's EBT card was initiated, thereby causing the FNS to deposit the same amount into the **SECOND OBAMA** account. **SECOND OBAMA**, therefore, realized a net profit of $49.99 for this unlawful transaction.

<u>March 11, 2013 Transaction</u>

44.     On March 11, 2013, CW-2 entered **SECOND OBAMA** and approached an unidentified employee ("UM") who was behind the counter at the cash register. The UM sent CW-2 "next door" to **D&M DELI**. CW-2 reported that the employee he/she spoke with in **D&M DELI** was "Danny", the same employee from the February 11, 2013 investigative operation. The following is an excerpt of the conversations transcribed from the recording made during the March 11, 2013 transaction:

| | |
|---|---|
| CW-2: | Hello. I'm tryin' to sell some stamps. |
| Employee: | Huh? |
| CW-2: | Tryin' to sell some stamps. |
| Employee: | Some stamps? |
| CW-2: | I want, I got some food stamps to sell. |
| Employee: | Machine not working. |
| CW-2: | That's what you all told me last month. |
| Employee: | I'm telling you the machine not work today go next door if you want to do it, next door |
| CW-2: | Behind me? |
| Employee: | Next door. |
| CW-2: | Alright |
| Employee: | Next door |
| CW-2: | Ok. |

[CW-2 proceeded to **D&M DELI**]

| | |
|---|---|
| DANNY: | Yes |
| CW-2: | How you doin? |

| | |
|---|---|
| DANNY: | A'right |
| CW-2: | They told me come in here, I got some stamps to sell. I got two hundred. |
| DANNY: | You want one hundred. |
| CW-2: | Uh-huh |
| | [DANNY completed the transaction with CW-2's EBT card] |
| CW-2: | Thank you. |
| DANNY: | You're welcome. |
| CW-2: | Ok. |
| DANNY: | Alright. |
| CW-2: | Thank you. |
| DANNY: | You're welcome. |

45.     It was confirmed that FNS records of this transaction reflect that DANNY swiped CW-2's EBT card for $199.73, thereby causing the FNS to deposit that same amount into the **SECOND OBAMA** account. **SECOND OBAMA**, therefore, realized a net profit of $99.73 for this unlawful transaction.

<u>April 9, 2013 Transaction</u>

46.     On April 9, 2013, the CW-2 entered **SECOND OBAMA** and approached an unidentified employee ("UM") and told him he/she "got some stamps to sell".  The UM at **SECOND OBAMA** didn't seem to understand CW-2 and told him/her "no food stamps."  CW-2 went into **D&M DELI** and approached DANNY, the same employee CW-2 had dealt with at **D&M DELI** during the February 11, 2013 and March 11, 2013 transactions.  The following is an excerpt of the conversations transcribed from the recording made during the April 9, 2013 transaction:

CW-2:       How you doin'?  I got some stamps to sell.  I got um, three
            hundred and twenty-five dollars.

DANNY:      How much is that?

CW-2:       I got three hundred and twenty-five dollars.

DANNY:      I give you...

CW-2:       All to..., well all together got three twenty-eight.  Three hundred
            and twenty-eight dollars on here

DANNY:      I give you one-sixty.

CW-2:       One sixty-four.

DANNY:      For ah...

CW-2:       You wanna take the whole...

DANNY:      ...three..., three hundred and twenty.

CW-2:       Three twenty?  Okay.

DANNY:      Okay?

CW-2:       Alrighty.

            [DANNY completed the transaction with CW-2's EBT card]

CW-2:       Alrighty.

DANNY:      That's okay.

CW-2:       Yes sir.

CW-2:       Thank you.

DANNY:      Yeah

47.     It was confirmed that FNS records of this transaction reflect that DANNY swiped

CW-2's EBT card for $319.74, thereby causing the FNS to deposit that same amount into the

**D&M DELI** account. **D&M DELI**, therefore, realized a net profit of $159.74 for this unlawful

transaction.

## August 1, 2013 Transaction

48.     On August 1, 2013, CW-2 entered **SECOND OBAMA**. The CW-2 approached

Amar Al-Jaberi,[4] who was behind the counter at the cash register. The following is an excerpt of

their conversation transcribed from the recording made during the transaction:

CW-2:       How you doing? I was going over to Danny, to uh sell some food
            stamps.

AL-JABERI:  What do you want?

CW-2:       I got a hundred.

AL-JABERI:  Ah no.

CW-2:       What, I gotta sell about fifty?

AL-JABERI:  [unintelligible]

CW-2:       Are you going to open the other store?

AL-JABERI:  No, it's closed.

CW-2:       So you'll going to do it over here now?

AL-JABERI:  If you, if you want to do it come back later [unintelligible].

CW-2:       Huh?

AL-JABERI:  If you want to do it with the owner, come back later when he's
            working.

CW-2:       The owner? About what time?

AL-JABERI:  After 5:00

CW-2:       After 5:00?

AL-JABERI:  He can do it them, I'm sorry.

CW-2:       So he'll be here after 5? What's his name?

---

4       On July 22, 2013, a FBI task force officer (TFO) entered SECOND OBAMA in an attempt to identify and
interview some employees who work at the store. A male employee in the store identified himself to the TFO as
Ammer Al-Jaberi. Al-Jaberi said his identification cards were located in his apartment above the store.

AL-JABERI:   Ahhhh, Obama. Obama. If you ask for Obama.

CW-2:   He the only one that can do it?

AL-JABERI:   Huh?

CW-2:   He the only one that can do it?

AL-JABERI:   Yeah.

CW-2:   Okay, thank you.

<u>August 7, 2013 Transaction</u>

49.   On August 7, 2013, CW-2 entered **SECOND OBAMA**. AL-JABERI was behind the counter at the cash register. CW-2 got in line behind a male customer. The customer, speaking to AL-JABERI, told him that another employee allowed him to buy cigarettes using "stamps" before. AL-JABERI said no. The customer asked AL-JABERI "where's the other dude at" and said "he just did it for me". The customer said "I'll wait for him them". CW-2 asked the customer if the machine was down. The customer said that the machines were not down, that AL-JABERI "doesn't want to be doing that all the time." The customer told CW-2 that AL-JABERI and **ALJARADI** are "cousins or something." CW-2 asked the customer which person does "it," referring to food stamp redemption. The customer pointed to a man outside the store in a white van, wearing a black shirt with red stripes (who agents had identified from surveillance as the owner of the store, **ALJARADI**).

50.   CW-2 exited the store and approached **ALJARADI** who was in the driver's seat of Vehicle #1. CW-2 explained to **ALJARADI** that he/she was trying to "sell stamps" at his store but AL-JABERI was pretending he couldn't speak English and wouldn't buy his/her stamps. **ALJARADI** told CW-2 to talk to the "bald guy" working in the store and he would do the transaction for CW-2. CW-2 went back into **SECOND OBAMA** and spoke to the bald

Page 22 of 35

employee (referred to herein as "UM-A"), who was stocking shelves.   CHS told UM-A that

he/she was trying to "sell stamps" but AL-JABERI was acting like he could not speak English.

UM-A spoke to AL-JABERI in a foreign language. UM-A asked CW-2 how much money he/she

wanted.  CW-2 said about $85.  AL-JABERI then swiped CW-2's card and the CW-2 entered the

PIN.  UM-A handed the CW-2 his/her card back and told him/her it was declined.   UM-A told

the CW-2 he/she only had $148 on the card.  CW-2 asked for $70. CW-2 gave his/her card to

AL-JABERI who swiped it and said something in a foreign language. The CHS then entered

his/her PIN and AL-JABERI took $70 cash from the register and gave it to CHS.  CHS exited

the store.

51.    It was confirmed that FNS records of this transaction reflect that AL-JABERI

swiped the CHS's EBT card for $140.00, thereby causing the FNS to deposit that same amount

into the **D&M DELI** account. **D&M DELI**, therefore, realized a net profit of $70.00 for this

unlawful cash transaction.

### D.    Analysis of SECOND OBAMA and D&M DELI SNAP Transactions.

52.    Analysis of the SNAP transactions at **SECOND OBAMA** and **D&M DELI**, as

recorded and monitored by FNS, disclosed patterns of suspicious SNAP transaction activity

indicative of trafficking.   The total monthly SNAP transactions conducted by **SECOND**

**OBAMA** and **D&M DELI** were much greater than those of similar sized stores located in the

same geographic area.   In addition, a substantial number of those transactions were of an

unusually high amount or were conducted in a rapid and repeated fashion.  These patterns are

consistent with illegal trafficking of SNAP benefits.

53.    FNS uses a classification system to aid in analyzing transaction activity and

volume by SNAP authorized retailers.  Retailers are assigned a classification based on store size,

layout, inventory and reported annual sales volume.  **SECOND OBAMA** and **D&M DELI** are classified as "convenience stores" in the FNS system.

54.      From the beginning of October 2011 to the end of August 2013, a 23 month period, **SECOND OBAMA** has conducted 81,490 SNAP transactions totaling $2,125,678.94 of redemptions, for an average transaction amount of $26.09.  Over that same period, **D&M DELI** has conducted 5,267 SNAP transactions totaling $143,466.05, for an average transaction amount of $27.24.  These amounts far exceed the number of SNAP transactions, total redemptions and average transaction amounts for comparable stores in the immediate geographic area and in the entire state of Maryland, indicating that the SNAP transactions are fraudulent SNAP.

      **1.**    **Comparison of SNAP Transactions at SECOND OBAMA and D&M DELI to Nearby and Statewide Convenience Stores**

55.      An analysis of **SECOND OBAMA'S** and **D&M DELI's** monthly transaction volume, as compared to the four geographically closest stores also classified as convenience stores by FNS, showed that both **SECOND OBAMA** and **D&M DELI's** SNAP redemptions far exceeded those of the comparable stores.  The analysis included stores similar in size and inventory to **SECOND OBAMA** and **D&M DELI**, located within a .75 mile radius, and which had no incidence of adverse criminal or administrative action during the review period.

56.      **SECOND OBAMA'S** monthly SNAP redemptions exceeded the average monthly redemptions of the 4 similar stores by more than $2 million from the beginning of October 2011 to the end of August 2013.  During that same period, **D&M DELI's** redemptions exceeded the closest comparable convenience store by more than $109,000.  In addition, during this time frame, the average SNAP purchase at **SECOND OBAMA** was $26.09 and at **D&M DELI** it was $27.24, while the average SNAP purchase at each of the other 4 stores in the

sample was $4.08.

57.    In addition, **SECOND OBAMA** and **D&M DELI** both consistently exceeded the statewide average monthly redemption and average individual redemptions for convenience stores during the same period.    **SECOND OBAMA**'s total monthly SNAP redemptions exceeded the state average by more than $2,043,320.65 from the beginning of October 2011 to the end of August 2013 and **SECOND OBAMA**'s individual transaction of $26.09 far exceeded the statewide individual transaction of $9.30. **D&M DELI**'s total monthly SNAP redemptions exceeded the state average by more than $61,106.76 from the beginning of October 2011 to the end of August 2013 and **D&M DELI**'s individual transaction of $27.24 far exceeded the statewide individual transaction of $9.30. Excerpts of these analyses for the preceding 23 months are presented below:

| Comparison of Subject Store vs. Four Neighboring Stores October 2011 through August 2013 | | | |
|---|---|---|---|
| Store Name | SNAP Benefits Received | Total # of SNAP Sales | Average amount per sale |
| **SECOND OBAMA** | $2,125,678.94 | 81,490 | $ 26.09 |
| **D&M DELI** | $ 143,466.05 | 5,267 | $ 27.24 |
| Browns Grocery & Carryout | $ 55,059.84 | 11,310 | $ 4.87 |
| Eutaw Market | $ 37,854.07 | 10,453 | $ 3.62 |
| St Mart | $ 29,782.10 | 7,507 | $ 3.97 |
| Vic's Grocery Store | $ 12,435.52 | 3,216 | $ 3.87 |
| STATEWIDE AVERAGE | $ 82,358.29 | 8,860 | $ 9.30 |

**2.    SNAP Transaction at SECOND OBAMA and D&M DELI Consistently Exceeded Statewide Average Single Purchase Amount.**

58.    Analysis of the individual SNAP transactions conducted at **SECOND OBAMA** and **D&M DELI** showed that both stores regularly conducted a high volume of transactions that

were three times greater than the statewide average SNAP transaction.

59.     In addition, several of these large transactions were conducted in a way, known as "structuring," to hide the fraudulent nature of the transaction from investigators. These large transactions and structured transactions are indicative of known patterns of illegal SNAP benefits trafficking activity. Your Affiant knows, from experience and the experience of USDA-OIG agents, , that individuals and stores engaged in fraudulent SNAP activity will charge half of a large transaction, wait for a short period of time (usually less than 24 hours), and charge a second transaction, so that the total fraudulent transaction is smaller and therefore less likely to be noticed by law enforcement. Your Affiant also knows, based on training and the experience of other FDA-OIG agents, that a large volume of individual transactions at the same location that consistently exceed the state average single purchase price is also indicative of illegal SNAP benefits trafficking activity.

60.     For example, during the month of May 2013, **SECOND OBAMA** conducted 3,741 transactions for SNAP benefits. Of these 3,741 transactions, 3,141 were three times larger than the average purchase amount of a convenience store in the state of Maryland, which was $9.29 in May 2013. The average transaction for **SECOND OBAMA** for the month of May 2013 was $30.56. Therefore, approximately 84% of the SNAP transactions at SECOND OBAMA in May 2013 exceed the state average by more than three times the statewide average amount. Of those 3,141 transactions, 316 transactions are indicative of structuring to avoid trafficking detection. These 316 transactions were conducted by just 142 households. Each of the cards was used at least twice in the same at the same store in less than 24 hours to make large purchases. A sample of the structured transactions is below:

| SECOND OBAMA Transactions Indicative of Structuring - May 2013 | | | | | |
|---|---|---|---|---|---|
| Household Number | Date | Time | Amount | Terminal ID | Total Flag Amount |
| 030740227 | 05/11/2013 | 12:13:40 AM | $58.65 | 02033001 | $158.28 |
| 030740227 | 05/11/2013 | 12:14:29 AM | $99.63 | 02033001 | |
| 471014569 | 05/07/2013 | 02:03:30 PM | $99.80 | 02033001 | $199.70 |
| 471014569 | 05/07/2013 | 02:04:40 PM | $99.90 | 02033001 | |
| 487011453 | 05/15/2013 | 02:58:15 PM | $42.75 | 02033001 | $242.74 |
| 487011453 | 05/15/2013 | 03:00:32 PM | $199.99 | 02033001 | |
| 463037806 | 05/13/2013 | 07:02:42 AM | $81.75 | 02033001 | $103.50 |
| 463037806 | 05/13/2013 | 07:05:05 AM | $21.75 | 02033001 | |
| 404025762 | 05/06/2013 | 09:13:33 AM | $99.99 | 02033001 | $199.98 |
| 404025762 | 05/06/2013 | 09:17:19 AM | $99.99 | 02033001 | |
| 446014245 | 05/24/2013 | 10:52:28 AM | $80.00 | 02033001 | $140.00 |
| 446014245 | 05/24/2013 | 10:57:12 AM | $60.00 | 02033001 | |
| 449013778 | 05/16/2013 | 08:55:36 PM | $54.50 | 02033001 | $114.18 |
| 449013778 | 05/16/2013 | 09:01:28 PM | $59.68 | 02033001 | |
| 030897568 | 05/12/2013 | 11:46:41 AM | $152.25 | 02033001 | $202.25 |
| 030897568 | 05/12/2013 | 11:54:33 AM | $50.00 | 02033001 | |
| 457015920 | 05/12/2013 | 10:24:20 AM | $51.18 | 02033001 | $103.92 |
| 457015920 | 05/12/2013 | 10:33:30 AM | $52.74 | 02033001 | |
| 492034102 | 05/07/2013 | 10:56:12 PM | $30.75 | 02033001 | $100.65 |
| 492034102 | 05/07/2013 | 11:06:40 PM | $69.90 | 02033001 | |
| 430045386 | 05/11/2013 | 12:16:01 AM | $106.50 | 02033001 | $187.49 |
| 430045386 | 05/11/2013 | 12:27:28 AM | $80.99 | 02033001 | |
| 410014217 | 05/14/2013 | 06:40:35 PM | $49.68 | 02033001 | $149.31 |
| 410014217 | 05/14/2013 | 07:00:10 PM | $99.63 | 02033001 | |
| 477007529 | 05/12/2013 | 06:47:51 AM | $139.90 | 02033001 | $170.40 |
| 477007529 | 05/12/2013 | 07:13:44 AM | $30.50 | 02033001 | |
| 467006204 | 05/10/2013 | 11:08:41 AM | $99.99 | 02033001 | $182.99 |
| 467006204 | 05/10/2013 | 11:42:48 AM | $83.00 | 02033001 | |
| 454013884 | 05/14/2013 | 12:06:30 PM | $49.99 | 02033001 | $110.64 |
| 454013884 | 05/14/2013 | 12:43:32 PM | $60.65 | 02033001 | |
| 445036136 | 05/12/2013 | 10:48:05 PM | $40.60 | 02033001 | $122.55 |
| 445036136 | 05/12/2013 | 11:28:37 PM | $81.95 | 02033001 | |
| 030697741 | 05/07/2013 | 10:05:02 AM | $68.99 | 02033001 | $124.74 |
| 030697741 | 05/07/2013 | 11:07:41 AM | $55.75 | 02033001 | |
| 030544736 | 05/14/2013 | 08:58:05 PM | $81.79 | 02033001 | $136.14 |
| 030544736 | 05/14/2013 | 10:01:31 PM | $54.35 | 02033001 | |
| 421013771 | 05/06/2013 | 09:09:48 AM | $99.99 | 02033001 | $140.71 |
| 421013771 | 05/06/2013 | 10:13:55 AM | $40.72 | 02033001 | |

61.     During the month of March 2013, **D&M DELI** conducted 1,066 transactions for

SNAP benefits.  Of these 1,066 transactions, 425 of them exceeded the average purchase amount

of a Convenience Store in the state of Maryland by 300 percent or more.     The average

transaction for a Convenience Store in the state of Maryland for the month of March 2013 was

$9.64.  During the same period, **D&M DELI** conducted 1,066 transactions total.  Of those 1,066

transactions, 110 of them are indicative of structuring SNAP transactions to avoid trafficking

detection.  These 110 transactions were conducted by 49 households.  Each of the cards was used

at least twice in the same at the same store in less than 24 hours.  The two purchases made by

each card often occurred within a minute of each other.  Each transaction is for an amount much

larger than the MD state average single purchase price.

| D&M DELI Transactions  Indicative of Structuring- March 2103 | | | | | |
|---|---|---|---|---|---|
| Household Number | Date | Time | Amount | Terminal ID | Total Flag Amout |
| 410016090 | 03/14/2013 | 03:24:32 PM | $149.66 | 02440001 | $289.40 |
| 410016090 | 03/14/2013 | 03:25:25 PM | $139.74 | 02440001 | |
| 456039071 | 03/13/2013 | 08:55:50 AM | $181.99 | 02440001 | $362.38 |
| 456039071 | 03/13/2013 | 09:03:31 AM | $180.39 | 02440001 | |
| 424013755 | 03/12/2013 | 07:48:43 PM | $102.85 | 02440001 | $155.70 |
| 424013755 | 03/12/2013 | 07:57:20 PM | $52.85 | 02440001 | |
| 030926335 | 03/12/2013 | 10:16:58 PM | $99.58 | 02440001 | $198.88 |
| 030926335 | 03/12/2013 | 10:26:10 PM | $99.30 | 02440001 | |
| 480033508 | 03/11/2013 | 03:27:39 PM | $69.80 | 02440001 | $119.47 |
| 480033508 | 03/11/2013 | 03:43:44 PM | $49.67 | 02440001 | |
| 030128442 | 03/12/2013 | 12:43:30 PM | $99.72 | 02440001 | $160.22 |
| 030128442 | 03/12/2013 | 01:26:26 PM | $60.50 | 02440001 | |
| 431020605 | 03/11/2013 | 01:23:23 PM | $39.65 | 02440001 | $101.12 |
| 431020605 | 03/11/2013 | 02:22:26 PM | $61.47 | 02440001 | |
| 030212105 | 03/11/2013 | 04:24:17 PM | $99.67 | 02440001 | $188.71 |
| 030212105 | 03/11/2013 | 05:04:51 PM | $39.67 | 02440001 | |
| 030212105 | 03/11/2013 | 05:27:53 PM | $49.37 | 02440001 | |
| 433015142 | 03/14/2013 | 10:50:10 PM | $99.43 | 02440001 | $168.97 |
| 433015142 | 03/14/2013 | 11:59:56 PM | $69.54 | 02440001 | |
| 465009966 | 03/11/2013 | 03:21:22 PM | $59.73 | 02440001 | $101.23 |

| | | | | | |
|---|---|---|---|---|---|
| 465009966 | 03/11/2013 | 04:44:57 PM | $40.50 | 02440001 | |
| 030086853 | 03/12/2013 | 04:27:59 PM | $61.25 | 02440001 | $101.75 |
| 030086853 | 03/12/2013 | 06:20:01 PM | $40.50 | 02440001 | |
| 030765712 | 03/12/2013 | 08:39:14 AM | $79.69 | 02440001 | $119.44 |
| 030765712 | 03/12/2013 | 10:32:41 AM | $39.75 | 02440001 | |
| 471023230 | 03/12/2013 | 09:34:24 AM | $79.99 | 02440001 | $139.72 |
| 471023230 | 03/12/2013 | 12:01:11 PM | $59.73 | 02440001 | |
| 030684916 | 03/15/2013 | 09:32:56 AM | $89.99 | 02440001 | $114.79 |
| 030684916 | 03/15/2013 | 12:19:32 PM | $24.80 | 02440001 | |
| 448027127 | 03/13/2013 | 06:26:20 AM | $81.25 | 02440001 | $141.14 |
| 448027127 | 03/13/2013 | 09:20:13 AM | $59.89 | 02440001 | |
| 448015190 | 03/15/2013 | 04:12:31 PM | $44.50 | 02440001 | $139.19 |
| 448015190 | 03/15/2013 | 05:05:16 PM | $54.85 | 02440001 | |
| 448015190 | 03/15/2013 | 07:12:06 PM | $39.84 | 02440001 | |
| 030908108 | 03/14/2013 | 09:50:08 AM | $52.99 | 02440001 | $137.99 |
| 030908108 | 03/14/2013 | 01:09:49 PM | $85.00 | 02440001 | |
| 030474055 | 03/11/2013 | 07:02:01 PM | $62.73 | 02440001 | $201.98 |
| 030474055 | 03/11/2013 | 08:55:02 PM | $59.73 | 02440001 | |
| 30474055 | 03/11/2013 | 10:45:31 PM | $79.52 | 02440001 | |

### ATTACHMENT A-1
### PREMISES TO BE SEARCHED

The Subject Location is **SECOND OBAMA EXPRESS**, 901 Harlem Avenue, Baltimore, Maryland (pictured below)



The premise of **SECOND OBAMA** EXPRESS is a three story, red brick building located at the southwest corner of the intersection of N. Freemont Avenue and Harlem Avenue. The front of the store faces northeast onto that intersection. The words "WELCOME **SECOND OBAMA**" are written in red lettering on a white sign on the Harlem Avenue side of the store. Above that sign is a sign on the second story for Romano's Pizza. The store's main faces North Freemont Avenue. 901 A is printed in black on a white sticker posted on the front door of the store.

**ATTACHMENT A-2**
**PREMISES TO BE SEARCHED**

The Subject Location is **D&M DELI AND GROCERY**, 901 Harlem Avenue, Suite B, Baltimore, Maryland (pictured below)



The premises of **D&M DELI** is a one story building, painted white on the front and red on the bottom of the front of the store and sides of the building. It is located between N. Freemont Avenue and Harlem Avenue. The front entrance of the store is facing N. Freemont Street. There is a glass display case on each side of the front door. The words **D&M DELI AND GROCERY** are written in black letters above the entrance of the store. There are some words written in black and highlighted in yellow paint under the name of the store. .

## ATTACHMENT B
## ITEMS TO BE SEIZED

The Subject Location shall be searched for the following:

1.    Records pertinent to the operation of the ATA Express, Inc., D&M Grocery, Inc. **D&M DELI**, and **SECOND OBAMA EXPRESS**

2.    Point of sale devices and receipts generated by point of sale devices.

3.    Any and all negotiable instruments including SNAP EBT cards, food stamp coupons, United States currency, foreign currency, money orders and cashier's checks.

4.    Telephone and address books.

5.    Records pertaining to assets held by ATA Express, D&M Grocery, Inc.  **D&M DELI**, and **SECOND OBAMA** EXPRESS

6.    Records pertaining to the exchange of cash for SNAP benefits, including ledgers and lists of names.

7.    Records of bank transactions, including but not limited to bank statements, check stubs or registers, canceled checks, deposit tickets, debit memos, credit memos, wire transfer documents, records of savings accounts including passbooks and statements.

8.    All records and documents identifying the location of safety deposit boxes or other possible depositories for cash and other liquid assets which are identified in any way with ATA Express, D&M Grocery, Inc.  **D&M DELI**, and **SECOND OBAMA** EXPRESS, its owners, officers, shareholders, agents, and employees, and any keys or other access devices associated with such depositories.

9.    All tax returns together with all associated schedules, work papers, and supporting documentation.

10.    Evidence of cash payments and evidence of transfer of assets.

11.    Any store security video or other recordings.

12.    All computer equipment and stored electronic data related to the operation of ATA Express, D&M Grocery, Inc.  **D&M DELI**, and **SECOND OBAMA** EXPRESS, to include:

13.    Any computer equipment and storage device capable of being used to commit, further or store evidence of the offenses listed in this affidavit;

14.    Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations,

monitors, printers, plotters, encryption devices, and optical scanners;

15.     Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

16.     Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

17.     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

18.     Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

19.     Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## ATTACHMENT C
## SEARCH PROTOCOL FOR ELECTRONIC DEVICES

1.      In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

2.      The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized as set forth in Attachment B.

3.      In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth in Attachment B.  In addition, the computer personnel may search for and attempt to recover "deleted", "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth in this attachment.

4.      The agents executing this warrant will file a return with the Court within 10 days of the search.  The return will describe the computer(s) and other digital storage media seized, and give an estimate of the time needed by trained forensic agents to complete a preliminary search of those items.  If that preliminary search indicates that an item does not contain data within the scope of the warrant, the government will promptly make that item available for pickup by the owner.

## V.    CONCLUSION

62.    As stated above, there is probable cause to believe that within the premises of **SECOND OBAMA**, 901 Harlem Avenue, Suite A, Baltimore, Maryland 21217, more specifically described in Attachment A-1 and **D&M DELI** AND GROCERY, 901 Harlem Avenue, Suite B, Baltimore, Maryland 21217, more specifically described in Attachment A-2 there is evidence and instrumentalities of violations of the Subject Offenses; to include the items listed on Attachment B.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Special Agent Jeffrey Weiland
Federal Bureau of Investigation

Subscribed and sworn to before me.

9/13/13
DATE

4:45 pm
TIME

The Honorable Susan K. Gauvey
United States Magistrate Judge

Page 30 of 35